May it please the court, my name is David Crosby. I am here this afternoon and this morning arguing on behalf of the village appellants. Seated with me at the council table is Jerome Juday, who represents Ciri Regional Corporation. Ciri has agreed to relinquish their argument time to the villages this morning. This dispute involves the interpretation of two interrelated agreements and implementing legislation that were entered into and enacted a quarter of a century ago and designed to resolve a problem that was created when the Bureau of Land Management rejected a number of ANCSA selections on the west side of Cook Inlet. The issue is whether these agreements and legislation either require or authorize the secretary to convey 30,000 acres, approximately 30,000 acres of relatively high priority 12A ANCSA selections to the villages on the Trinitna Peninsula. In 1974, the villages of Cook Inlet filed their 12A selections under ANCSA. Included within those selections were so-called deficiency selections on the west side of Cook Inlet, including 30,000 acres in dispute here on the Trinitna Peninsula. Unlike most of the withdrawals made for the benefit of individual villages for ANCSA selections, these deficiency withdrawals were made in common. In other words, all the villages had to compete with one another for the best lands in this area. In order to come up with a fair selection pattern, the villages agreed among themselves to a system of rounds, much like a professional football draft or something like that. The villages' total acreage entitlement was divided up into units. They would then select in rounds, and when the next round came around, they'd take the highest value selections to them. The problem with this selection method was that it potentially conflicted with the ANCSA selection requirements that village selections be compact and contiguous. There was going to be a checkerboard pattern due to this round selection process. So the villages went to the Bureau of Land Management and got a written assurance from the Bureau of Land Management that if the total selection pattern of all the villages was compact and contiguous, then that would be acceptable to BLM, notwithstanding the fact that the individual village selections might not be compact and contiguous. The selections were filed. About a year later, the same bureaucrats who had given that advice to the villages reneged and rejected a number of selections, not all the selections, but a number of the selections on the west side for a variety of reasons, including failure to be compact and contiguous for the individual villages. As you can imagine, this decision set off a firestorm here in Alaska and back in Washington, D.C. The Secretary of the Interior promptly vacated the decisions and sent his two top deputies up to Alaska to negotiate a solution. One of these, the Deputy Assistant Secretary for Parks, Mr. Curtis Boland, became the government's principal witness of trial. In 1975, Mr. Boland had negotiated a complex three-way exchange between the United States and Syria and the state of Alaska, the intent of which was not only to improve the lands that was available for serious selection, but also to clear the way for creation of the Lake Clark National Park. Congress made this deal, and that was a project that was very near and dear to Mr. Boland's heart. Congress made this deal contingent upon the villages, who were not parties to the terms and conditions, the villages relinquishing a number of selections that they had in the heart of the park, right on the shores of Lake Clark. Interestingly enough, Congress did not require the villages to relinquish the selections and questions here on the Tunica Peninsula. There were incentives for them to voluntarily trade out of these selections, but they were not required to relinquish them. Indeed, the terms and conditions which Congress enacted into law provided that the village selections within Lake Clark National Park would never be taken from them without their consent. Mr. Boland, fearing that the villages would veto the terms and conditions, came to Alaska in the words of one of the government witnesses in order to pacify the natives. He certainly wanted to preserve the terms and conditions. He testified under oath, however, that he had no intent whatsoever to win additional concessions from the natives, and he had no intent to use these rejections to leverage the villages off the Tunica Peninsula. Now, there was a second co-equal negotiator for the government here whose role has been largely forgotten because after he was deposed in this case, he died in a very tragic riding accident. That was Chris Barron, who was there representing the Bureau of Land Management. He gave testimony that was very favorable to the villages in his deposition. He died, he wasn't there at trial, and his testimony was largely ignored. He testified that the Bureau of Land Management didn't care what lands the natives got, as long as they could avoid an adverse precedent on the issue of compacted contiguity, and that they could minimize the Bureau's surveying costs to survey the village selections. All the negotiators in this process testified that they had a common goal to return as nearly as possible to the status quo ante that existed prior to the rejection of these selections. The general mechanism that they agreed upon was in essence to launder the village selections through a larger conveyance to the crook in the region. On August 23 of 1976, the government representatives had their only meeting with the villages. The government representatives testified that this was not a negotiated session, that they never negotiated directly with the villages. This was simply for purposes of information. The most important piece of information that the villages heard came from Mr. Boland, who repeatedly stated that the solution that was being worked out would validate the village 12-day selections. Mr. Boland and Mr. Farrin stood by while a CERI representative told the villages that the selections on the Chinook Peninsula would be withheld from a first conveyance from the United States because the United States was still interested in trying to work out this exchange for selection rights that was described in Section 7B of the Terms and Conditions. But that, that the villages decided they did not want to exchange, that they couldn't find valuable lands to exchange for, that these lands would be conveyed to them. That was a quotation directly from the transcript of this meeting, and Mr. Boland admits that he heard that, all the other government representatives admit that they heard that and they understood that and they made no objection. Five days later after this meeting, the villages in CERI signed an agreement, so-called Village CERI Agreement, in which CERI agreed that whatever lands were conveyed to it by the United States would be reconveyed to the villages in strict accordance with their 12-day selections and their selection priorities on file with the Bureau of Land Management. Three days later, without the villages being present, CERI and the United States signed the so-called Efficiency Agreement. Paragraph A of that agreement requires the Secretary to convey a block of lands described in Appendix A to CERI. Paragraph B says that CERI will reconvey these lands to the villages in accordance with Appendix B, which is the Village CERI Agreement, which was attached. Paragraph C says that if the lands conveyed to CERI out of Appendix A are insufficient to satisfy the villages' statutory entitlement, then the Secretary will make additional conveyances out of Appendix C, another list of lands. The villages did not sign this agreement. They were not asked to sign this agreement. The agreements were rushed back to Washington, D.C. All this takes place in about a week's time. These relatively complex agreements were rushed back to Washington, D.C. Congress enacted Public Law 94456. Paragraph B of that statute reenacted the revised Terms and Conditions, and that's significant, because at the same time that Congress is passing authority for the Secretary to convey these deficiency selections, it's also reenacting the Terms and Conditions. Paragraph 7 of which says that the villages may exchange their selections on the Chenette Peninsula for lands out of region. It also says it's a voluntary exchange of the option of the villages, and it also says that the village selections within Lake Clark National Park will never be taken without their consent. Asked in the very same statute, which in Section C grants the Secretary authority to convey lands under selection by the villages to CERI for reconveyance to the villages. No mention of the deficiency agreement. Treated very differently than the Terms and Conditions. The Terms and Conditions is reenacted as federal law binding upon the Secretary and upon CERI and upon everybody else, of course. That's not done with the deficiency agreement, which is not even mentioned in Paragraph C. The U.S. position is that statutory entitlement, as it's used in Paragraph C, means simply acres. That's all it means. As far as the government was concerned, the selections were dead. Words of Paul Curtin, you can take them out and burn them. Since there's enough acres left in Appendix A to satisfy acreage entitlement, the Secretary therefore says the government has no duty and not even any authority to convey any lands from Appendix C. It's the villages and CERI's position that the obligations of CERI in the United States can only be understood in terms of the village CERI agreement. There was testimony from all the witnesses that the intent was that this was to be the centerpiece. The village CERI agreement was going to be the centerpiece, and the government's witnesses said what comes after in terms of the CERI U.S. agreement is supposed to be consistent with the village CERI agreement. Let me ask you about the interpretation of statutory entitlement. Does that ultimately go back to an understanding of ANCSA and how that's interpreted? No. The government's position is that statutory entitlement can only mean what ANCSA says. This is an agreement. This is a separate agreement which is enacted by Congress, but of course it does refer back to the Alaska Native Plains Settlement Act, which I think is pretty clear. Section 14A of the Settlement Act says that the villages are entitled to a patent of so many acres, and that's what the government hangs their hat on. You get a patent of so many acres, that is your statutory entitlement. But the very next sentence says that the lands that are to be conveyed, are to be patented, shall be the lands selected by the villages. You cannot separate acres from selections. Of course you have to know the acres. You have to be able to make the computations. That's part of statutory entitlement. Of course it is. But it's not the whole part of statutory entitlement. My question then, whether we agree with the government or not, because it does involve this interplay between Sections Paragraph C and the term statutory entitlement, which really by definition has to refer back in some respects to ANCSA, even if we take the two phrases out of ANCSA, do we give deference to the Department in terms of its interpretation? I think you do not for a couple of reasons. Number one, this is an agreement. It's not the statute. We're not talking about construing the statute. We're talking about construing the agreement. The United States obviously has an interest in how this comes out. They're not simply acting as a steward of the public base. This is an agreement between the United States and the natives. But perhaps more importantly, the Enabling Act that put this case into U.S. District Court said that Congress wanted this to be a hearing based upon all the facts. They did not want this to be a hearing based upon the administrative record. It was something where there was to be no deference given to the United States in these proceedings. I'm sorry, you're now referring to the Enabling Act of the legislation that adopted the Deficiency Agreement? No, no, I'm sorry. There was a statute that extended the statute of limitations and permitted the filing of this case and said that in the event that this case is filed, the court shall move out of the argument. And again, it's the diligence position that you have to read. In essence, the first time we went through this on summary judgment with the District Court, the District Court said this agreement is ambiguous. Both sides have a plausible explanation. I've got to go to trial on this. And its final decision, the judge said this isn't ambiguous. I don't have to apply any rules of construction or anything else. And the reason why I don't have to do that is because the Village Surrey Agreement is not part of the Deficiency Agreement. It's referenced, but it's not incorporated. If you incorporate it, then somehow you have to reconcile the language about the Secretary making conveyances for the purpose of Paragraph B, which is the Village Surrey Agreement, which helps you to understand what was meant by statutory entitlement. I think that the conveyance agreement is certainly useful to try to understand the whole setup. My question would be how you would bind the United States to that agreement, which is between the Villages and Surrey. No, that is the $64,000 question in this case. Why did the United States not require the Villages to sign off on the Deficiency Agreement? Why are there two agreements here? To me, it made some sense that you have the Deficiency Agreement that set out the parameters, and because it was Surrey that was then doing the conveyances, how it was going to do those was kind of in a way its own business. To me it made some sense structurally, but I'm now trying to figure out legally how to fit the agreements together. You don't have to say, the government says that it can't be bound by an agreement to which it's not a party and that can be changed by those parties. You don't have to go so far as to say the government is bound by that, but you have to interpret the government's duties under the Deficiency Agreement in terms of the language of that second agreement. It's in there, it's referenced, that's what Surrey is going to do with the land. It tells Surrey only may convey 12A selections to the Villages. It has no authority, no power to convey anything other than those 12A selections. And the government knew that. They knew that when they signed that. So why didn't they make the Villages sign this agreement? The consequences of this agreement for the Villages are staggering. They're going to lose 30,000 acres of relatively valuable land and being forced to take 30,000 acres someplace else that they didn't select, that they don't want, that they might come to them later under 12B selections, but 12A's are the heart of their entitlement, what they want most, what they selected first. They're not going to get those. What binds them to that? The Secretary may not be bound by the agreement between Surrey and the Villages, but what binds the Villages to the Secretary's agreement? Why weren't they made to sign that? Or, in the alternative, why didn't the Secretary insist that this agreement be enacted into positive law? Then at least the Villages would be bound. It wouldn't resolve the ambiguities, but it would at least make sure that the Villages were bound by whatever it was that the agreement meant. Was there any effort, since all of this followed in a series of events, to enact the conveyance agreement into law as part of the package? I'm sorry? Was there any effort to enact it into law and make it part of the package? One of the government's chief lawyers, Paul Curtin, said that he urged that and that it was rejected. It was not done. I'm not sure. We don't have something in the legislature. No, there's nothing that indicates why. Although, the major concern here was the terms and conditions. That was the big agreement that gets reenacted at the same time, and they were very concerned that this big agreement that had been worked out over a period of perhaps six to eight months, that whatever was done in the deficiency agreement would be consistent with the terms and conditions. And I think one reason why they didn't want to enact the deficiency agreement into law was because they weren't quite sure they were supposed to be consistent, and the legislative history says they're supposed to be consistent, but the major thing was to make sure that the terms and conditions worked. So, why didn't the government have to even sit down and negotiate with the villages? They never even had a negotiating session with the villages. The reason why is because the villages were not being asked to give up a thing. They weren't being asked to give up a thing. And that is precisely what Chris Barron, the BLM's negotiator, testified to in his deposition, which was ignored by the district court. He said the intent was that the villages would get their 12A selections through a corrected mechanism. And he also testified that the government's current reading of this agreement, and remember the government's bounced all over the place in terms of what this agreement means, the government's current reading of this agreement is inconsistent with what he understood when he negotiated that agreement. When he negotiated that agreement, he understood that the villages were going to get their 12A selections that were rejected by the Bureau of Land Management only through a corrected mechanism. So the corrected mechanism, the government had to make sure that lands got to the villages from Syria in order to carry this out, but it didn't care if the villages were bound because the villages weren't giving anything up. One question that got asked repeatedly at trial is if these selections were so very important to the villages, why did they agree? Incidentally, the district court says that these lists were negotiated. There's no evidence that they were negotiated. Bolden says he didn't care what went in there as long as it was consistent with the terms and conditions. Farron said the Bureau of Land Management didn't care what lands they got. They were just worried about their precedent here. So why would the villages, everybody said that the natives put these lists together. Why would the natives agree to put their 12A selections in the Chinitla Peninsula in this second list? And there are two answers here. Number one is that the agreement did have to be consistent with the terms and conditions. It did express an interest in acquiring these lands and expressed an interest in acquiring them through an exchange of selection rights for lands out of region. And as was explained in just so many words in the only meeting between the government representatives and the villages, these lands were going to go into that second conveyance to allow the United States time to work out an acceptable exchange of selection rights for lands out of region. They wanted to do selections rather than conveyances because conveyancing is a long, time-consuming, you have to go through easements, you have to go through title reports. They didn't want to do conveyances and then a trade. They wanted to do selections. And that was said to the villages in the presence of the United States representatives with no objection whatsoever. Also, in this particular area on the Chinitla Peninsula, since the terms and conditions said that you could only put 12A selections there, they weren't going to, I don't know if the court understands the distinctions between 12A and 12B, but there's a second round of village selections that you couldn't put 12Bs on the Chinitla Peninsula and Syria couldn't take land on the Chinitla Peninsula. So all you could get there were going to be these 12A selections. And at that time, in 1976, they didn't know whose selections they were because there were still disputes about eligibility of villages in the round. So if there were only going to be selections, they didn't know whose selections there were going to be or indeed where those selections were, who was going to get them. I'm out of time. There's some comment in the briefs that the agreement, the government-Syria agreement, provides that lands, if it gets to conveyance from sea, would be done in a particular order which is not consistent with the order that would be in the agreement between Syria and the villages. And the argument is that that supports the government's view. There are a number of things that this agreement can't explain all the inconsistencies, but when you look at this agreement and realize it was negotiated over a week's period of time and you look at this list of priorities, it's very strange. There are priority categories and then within these lists, within these priority categories, there are selections that are listed in the manner that the Bureau of Land Management always lists selections. It runs from top, right corner, section A, all the way down to 36. When I first asked the man who knows more about this than anybody else, Phil McClure, I said, well, is it a priority category or are there priorities within the priorities? Because most of these selections fall within the category A priority. And he looks at it and he says, no, that's just the way we always list them. There's a priority category, but I can't tell if there's priorities within the priorities. He then came back around and said, oh, no, there's priorities within priorities. But the lists themselves are ambiguous. Also, once the terms and conditions went into effect, now remember paragraph L, the deficiency agreement. Once the terms and conditions go into effect, you can only put 12 A selections into that peninsula area. So right away, your lists are out the window. You've got to go to selections. You can't just do this lawnmower method of starting across the top and weaving back and forth. And then the final thing about the ambiguity about these lists is why so much acreage? Why so much acreage? There's a ton more acreage. This is a 12 A agreement. This is supposed to solve 12 As. Why is there all this acreage in Appendix C? We're talking about in order to satisfy the village 12 A acreage entitlement, another 30,000 acres. There's thousands and thousands of acres in this Appendix C. Why? Because there's something else going on here. The villages were concerned about getting their 12 As. Syria and the United States were concerned about what if the terms and conditions goes down. So they're talking about where are we going to put 12 Bs if the terms and conditions go down. They're working with all kinds of contingencies. We're not saying that we can solve every inconsistency in these old agreements. The government can't solve them all either. What we say is that this captures the big picture. The big picture was that everybody went out there and tried to get back to the status quo ante. It also explains why there's two agreements and why the villages didn't have to sign the deficiency agreement. Finally, and most importantly, it honors what the natives themselves were told by the government representatives that these agreements were going to do. Thank you very much. Thank you. May it please the court. My name is Andrew Mergen. I'm with the Justice Department in Washington, D.C. and at the council table with me this morning is Bruce Landon, who is a Justice Department attorney here in Anchorage and has been intimately involved in these proceedings. I've argued before this court previously, but I don't think I've ever argued a case in where the characterization of the issues is so starkly different as it is here. I say that at the outset because there is much in what Mr. Crosby said that I disagree, and I'm hoping to get to it all. At bottom, the issue here is the plain meaning of the deficiency agreement. That's what the district court, I think, appropriately understood this dispute really to be about. And that document, as you know, is intended to resolve this dispute regarding DLM's rejections of the village's 12A selections. Mr. Crosby refers to it as an agreement intended to put the parties back to the status quo ante, and I disagree with that characterization of the agreement. I think that what the evidence shows from our witnesses is what their desire was really to make sure that the villages got their 12A statutory entitlement, not to give them the precise 12A selections that had been rejected by DLM. And part of that, and I would refer the court to the McClure testimony, the Curtin testimony on these issues, because part of it is those rejections by DLM in many respects were, I mean, the presumption ought to be that those rejections were lawful. And this deficiency agreement was designed to get the villages their 12A entitlements, notwithstanding the lawful nature of the DLM rejections. And one of the things that Mr. Crosby has suggested this morning is that the rejections were all based on the erroneous advice received by the villages from DLM. He didn't say they were all. He said that they were rejected for that, not contiguous, and other reasons. Right, and they were rejected for other reasons. And thank you, Judge Canby, for pointing that out, because I want to make sure that folks understand that there were a number of reasons that they were rejected, some of which were discussed in Footnotes 7 of our brief. So to go back just a second, our goal in this was to get the villages their 12A statutory entitlements, not necessarily to return the villages to the status quo ante, to give them all of their rejected 12A selections, because, quite frankly, that may not have been possible as a matter of law. Now, one thing, though, I think that's important for the Court to bear in mind, and you can get there from the record. Regrettably, our brief doesn't make this point explicitly, but ultimately what the villages have gotten here in terms of their 12A selections is about 93% of the lands that they originally applied for or rejected, of the 12A highest priority selections. And how do I get that number? I want to be very clear how we get there. If you look at, I think it's Exhibit 4, that's their 12A selections that were filed with BLM. And if you look at the pretrial order, which is also in their excerpts of record, you'll see the 30,000 acres in dispute. And overall, they have ultimately received about 93% of what they were looking for in terms of their highest priority 12A selections, which if you think about where they were in 1976, having had many, many, I think is the adjective that Judge Singleton used, many of their 12A selections rejected, at the end of the day to obtain, by virtue of this deficiency agreement, 93% of their highest 12A priorities, that's really a fine bit of negotiating here. I think this is clear from our brief, but I think it's important to reiterate, however, that Mr. Crosby has characterized the record as showing that the villagers were promised 100%. They had an expectation of getting all of their 12A selections. And we would submit, actually, that the record doesn't show that at all, and I think the really pertinent parts of the record occur both in Judge Singleton's opinion and also in our brief, that Carl Marsh from Siri early on said, you guys got to understand, speaking to the villagers and folks, you're not going to get 100% of what you're looking for. The proposal Judge Singleton found that they all emanated from the Siri village camp. Mr. Crosby has not challenged that characterization, that finding by the district court. And every one of those drafts that are in the record here of this proposal contains the same basic mechanism, a big block in A followed by a block in C, which Carl Marsh from Siri describes as a minimum conveyance and possibly some additional lands in the south, referring to the Chinitna Peninsula, which if you look at some of the maps that the plaintiffs have submitted, you'll see that the Chinitna Peninsula lands lie to the south of Texodney Bay, and those are the lands that Marsh is saying in the village minutes we might get down the line. Now, Mr. Crosby's characterized the testimony as representing an expectation that they were going to get everything. Well, as Solicitor Leshee points out in his opinion, boy, if you were going to negotiate agreement to give them their 12-day selections, this wouldn't be the agreement because you could write something a lot more simple than this two-block mechanism, right? But I think that this expectation that the plaintiffs are referring to comes from some uncertainties that were at issue at the time of the 1976 agreement, and there are three primary uncertainties regarding the village's 12-day lands. That is, the eligibility of Alexander Creek and the Salatmatoff village as villages, and that was due to the fact the number of acres available in the 12-day determinations, and that's why, as Mr. Crosby explained, the villages went through a number of home sports-type drafts in terms of selecting the acreage because they had to look at the contingencies. Was Alexander Creek in or out? There was also the issue of the mental health lands. Those are some of the best lands in the state, and the initial determination of DOI was that those lands were not going to be available as 12-day lands. That decision was challenged all the way up to this court, and this court in 1988 rendered a decision saying that those mental health lands were available. And then finally there's the issue of how many ultimately of the 12-day lands were ultimately going to be conveyed. What I'm trying to explain is the reason you had a two-block mechanism, an immediate conveyance mechanism in Appendix A and a possible Appendix C conveyance mechanism, was because you didn't know how many lands were going to be required to satisfy the village's 12-day entitlement, which, again, was what the goal of the Department of Interior negotiators was, to make sure that they got their statutory entitlement. And the reason you didn't know was because of all of those contingencies. So I'm afraid that part of what's going on here is that a lot of folks thought that they were going to get more than they ended up. They ended up with 93 percent of their highest priority 12-day selections, but they thought they were going to get more. But the bargain they struck was an initial conveyance out of A and only going to C if A was not sufficient. And that was the bargain that they negotiated. The drafts came from- Who's they? Who's they? In terms of villages? Yeah, that's a very good question, O'Connor. The they is the theory here, the villages. You'll see testimony, for instance, in the record and in the minutes from Agnes Brown, who was a village representative who also had a role with Syria. Fred Elsovoff from- I may be mispronouncing his name, I'm sorry. But you'll recognize it when you see it, who I think is from Seldovia,  Some of this is explained in the McClure testimony, and I would refer you to that. So as an initial matter, it's not a question of Syria and the villages. There's dual hats being worn here. But most importantly, I think, is the fact that if you look at Appendix B, you'll see that the villages expressly endorsed the deficiency agreement. They refer to it as legislation because up until the final moment, that was the plan. But they endorsed the deficiency agreement. And the deficiency agreement in paragraph F says, you know, the lands- only the following lands shall be conveyed to the villages. The lands conveyed to Syria by this agreement or by the terms and conditions. This is the deal that the villages signed on to. In the Appendix B, they back the deficiency agreement. That's clear, for instance, from the McClure draft. Can I just back up here? Sure. I'm sorry, there's a lot going on. Appendix B to the deficiency agreement is the agreement between Syria and the villages. Right. And you're saying that by virtue of a two-party agreement between Syria and the villages, which is then attached to the deficiency agreement, is exhibited for Appendix B, that that means they back the deficiency agreement? That's not all I'm saying, Your Honor. But why would that be? In other words, I could attach this to my agreement, and it wouldn't mean that all the people who put anything in this book agreed with anything in my agreement. No, that's right. But there's language in Appendix B. It's paragraph one. of Appendix B, in which the villages expressly endorse the deficiency agreement. And this argument about the villages' role in this and their agreement to it is one that is really pressed for the first time in the village and Syria's second reply brief, the reply brief submitted to the environmentalist's amicus brief. So it's not an issue upon which there's necessarily been a lot of briefing on our part or really any evidence before Judge Singleton, because this is a somewhat new argument. But I believe that the Court has the complete record before it, even besides those matters in the excerpts from the record. So if you look at the McClure draft of the deficiency agreement, I think that's P-20, is that right, Bruce? P-20 is the... P-20, which is the McClure draft. P-20, I think, is the McClure draft. It's discussed in McClure's testimony. And then there's Exhibit D-20, which is an agreement from the Seldovia village endorsing the deficiency agreement as it appears in the McClure draft, which is Appendix A. I'm sorry that this is complicated, but this argument has really been pressed initially in the reply brief. In any event, what the McClure draft and D-20, which is the Seldovia agreement, the language in Appendix B, which is Paragraph 1, all show is that the villages supported the deficiency agreement. And that's not really surprising given the fact that it's not as if there was Siri and there were the villages. There were the villages and Siri working together. There's evidence in the minutes that the villages understood that Monroe Price, a very capable federal Indian lawyer, federal Indian law practitioner, was representing Siri, and he was authorized to represent the villages in those negotiations. And there's a line from Agnes Brown exactly to that effect in the minute notes that are included in the excerpts of record. There's, I think, Price's testimony at P-108 and 19 also says that the villages understood that they would be represented by Siri's agent, Price. The minute notes at P-20 and 21, Mars at P-130 and 18. So the shell game that the villages somehow, the suggestion that the villages have somehow not agreed to this, is really not supported by the record at all. Some of the villages, I suppose, the burdens fall on equally. I mean, you say they've got 93% of their priorities, but there could well be villages, most of whose 12-day selections are in fall into seed, wouldn't it be? No, I think that the record, there was a map submitted in the district court, an oversized map that is always referred to as the Chinese checker map, which lays out the selections, and I think that there's really been no claim on the part of the villages here that this system resulted in any inequities for them. After all, they agreed to the method system. They agreed to the method, but of course, they did this in a round of drafts and things, and some of which got into seed land. Yeah, no, that's true, but again, I don't think, I mean, just give me, I guess I understood your question to be, was there any particular inequity to any of the villages? What stimulated my question was you were saying, well, the villages really agreed to this, and that made me think, well, would a village that was standing to get clobbered by this division of A land and C land really agree? Well, I think what the record shows, and what Judge Singleton found, I think this is really important, is that the proposal came from Siri and the villages. I mean, that's very clear from Boland's testimony and McClure, who were negotiators on the part of the federal government. What happened is the villages of Siri met together, and they had a very strong desire to get the lands quickly, and that desire is reflected in two places off the top of my head. One is in the minute notes where you see the village and Siri representatives talking about the need to get the lands quickly, and also it's reflected in some of the testimony. McClure, for instance, talks about the sense of urgency that's conveyed to him by the negotiators, that they want something that's going to get them lands quickly, and that makes a lot of sense in the context of the time, because at the time, resolution of the Alexander Creek-Solomont-Matov eligibility is out there, and it may not be resolved for some time. Also, recall that part of the reason that they came up with this, and I think this is very clear from Judge Singleton's opinion, why the villages and Siri came up with this proposal in blocks is because it eased the surveying burden to BLM quite a bit, which is one of BLM's concerns, and one of the reasons for the contiguous compactness requirement is you don't want to be in a position where putting in these monuments and surveying the lands is just this incredibly onerous, difficult task. That's clearly not what Congress intended in ANCSA. So they came up with this proposal. That is really reflected by the drafts that were before Judge Singleton. We submit, I think, and this is also clear from the briefs, that the language is really unambiguous, the language of the deficiency agreement, that A provides convey as soon as possible all public lands described in Appendix A, and C, to the extent that the lands conveyed pursuant to A are insufficient to satisfy the statutory entitlement, you go to the C lands. This is what Judge Singleton found, and I think that it's supported by plain reading, and Judge Canby, you noted that language that requires C, that the distributions of C lands be in that priority, which is inconsistent with the Appendix B process, and recall that Judge Singleton found that the Appendix B was really an instrument negotiated between the villages in Syria, not incorporated into this agreement, and there's no reason that Paragraph B or Appendix B should trump what is really an unambiguous reading of the deficiency agreement. Now, there's some suggestion here that I also strongly disagree with, that one, that Appendix B is somehow the driving mechanism of the negotiations going on here. That really can't be the case, and let me tell you why. I think that the documentary memories fade in over 25 years. Judge Singleton was very impressed by the drafts and documentary evidence that he had before him. Our case was really tied to trying to explain those notes, that documentary evidence, and the testimony from the witnesses more completely explains that evidence than the theories advanced by the villages in Syria, and if B were the driving mechanism of this settlement, it wouldn't show up until pretty much the last moment. If you look at the mature draft, which may be the third or fourth draft of the deficiency agreement, at that time, the villages, these proposals are coming from the villages in Syria. That draft doesn't even talk about the conveyance. It says, we're going to hold these lands and its tenants in common, because they were concerned about getting the lands, the expedited transfer of this block of lands in A. The B issue was not foremost and forefront for them, and that's why they keep telling us, we're going to figure this out amongst ourselves, and there's that evidence in the record. You don't need to be a part of B. There's also been a suggestion this morning that somehow our interpretation of the deficiency agreement is in conflict with the terms and conditions, the separate land transfer. Things to keep in mind when you review the TNC is that it's an agreement that is not just about the Park Service and Lake Clark. It's about getting the corporations and the villages a very, very good deal on oil-producing lands on the Kenai Peninsula, and that's made clear not only just in the lands that issue in the TNC, but also in Paul Curtin's testimony, Paul Curtin's transcript of testimony in the court. Now the suggestion is that, has been made that the TNC jogs with their interpretation because, you know, it's all about exchanges of Kenai Peninsula lands in Appendix C. Look at the testimony of Christy Favorite from the BLM, who, I mean, the testimony is pretty detailed, but what she explains is that the TNC applies now. There are Appendix A lands that qualify for the exchange provisions in the TNC, and that testimony, I think, begins on about page 78 of Favorite, which is in the supplemental excerpts provided by the United States. So the TNC is an important agreement to be sure, but its relationship to the deficiency agreement, which after all is about getting the villages their 12A entitlements, is not as it has been described here. What then was the motivation in setting aside the C lands? What was the motivation in setting aside the C lands? I think what becomes clear is, I thought it was probably because it was subject to the terms and conditions peculiarly. Well, that's part of it, right? That some of those lands are 12A selections. There's this difference between what's available under 12A and 12B, but I think really the difference, I mean, Judge Singleton found that the contents of the A and C were negotiated by the parties, and I will be candid with you and say that I think that that's an overall sense. Just like Mr. Crosby, I'm not in a position to say this statement in the minutes or whatever proves this, but I think that when you look at the testimony of people like McClure and Boland, they weren't adamant about what particular lands that they wanted, but they didn't want, they were interested in some stuff, and they knew that the villages weren't necessarily going to get everything they wanted. But if you look at the contents of the Appendix A lands, the villages at that time made a decision about the stuff that they wanted conveyed immediately. One of the things that's not represented in the maps attached to the plaintiff's briefs, because it's pretty much in the Tuxedne Bay and Shenetna Peninsula area, is that the villages got a lot of lands in the Talkeetna Mountains, a long way from western side of Cook Inlet, on the Susitna River. And if you look at Curtin's testimony, he explains that there was a reason that the villages were really interested in those Talkeetna lands, and that's because there was a proposal for a hydro development, had been kicking around for a long time, called Hell's Gate. And so there were lands here that the villagers were particularly interested in, those Hell's Gate lands. A logging operation on Tuxedne Bay, that is part of the Appendix A lands that they've been able to put to use, because they prioritized the conveyance of those lands. You know, what's valuable at one time or another changes in people's mind. I mean, at the time, in 1976, I think, one of the things that the Park Service has been interested in is preserving Lake Clark as a microcosm of Alaska and the Alaska ecosystems. And so there's been some interest on their part in preserving Cook Inlet coastal lands. They could have gotten those lands on Appendix A, or they could have gotten those lands on Appendix C. The villages in Siri have specific goals for some lands, like the Tulkena Mountain lands. The story today is that these Tunintna Peninsula lands are, you know, the most important lands, and that the agreement hasn't been honored because they didn't get those lands. But they got 93% of what they were looking for in 12A, and Judge Singleton found that this agreement reflected the intent of the parties. Mr. Maher spoke of an initial minimum conveyance. He also spoke of not getting 100%. At the end of the day, they did pretty well. There's a ton of stuff that I probably haven't covered, but I know that I'm out of time. If there are any particular questions from the panel, I'd love to answer them. I do have one procedural question. You know, normally we would look at an agreement de novo in terms of, you know, whether or not as a matter of law it's unambiguous. And so here we have kind of an odd situation where the district court went through a whole file, and he has a whole series of findings and facts. Some relate, say, specifically to Ninielchik, and others relate to the history of the agreement. But then in the end, he says it's unambiguous. So what do we do with these findings of fact, if anything? Where do they fit in to your analysis and your position? Well, I think that the meaning of the deficiency agreement can be determined without going beyond the four corners of the document. And I think that that also drives the resolution of the Ninielchik issue, because, as you know, Ninielchik has plenty of appendix A lands that it can use to obtain its 12A entitlement. I think that ultimately, the fact that Judge Singleton had a hearing and looked at the extrinsic evidence and that confirmed his view, I would say to the court that, you know, the court is kind of in the same position as Judge Singleton, because what he found is, at the end of the day, looking at the four corners, I got all the information I need to know. It's nice to know that the extrinsic evidence confirms that interpretation. I don't think this court... I like legislative history. Right. I think that's a good observation, Your Honor. You asked about the construction of the term statutory entitlement, and we do, of course, think that our interpretation of that term is entitled to deference, because it is an ANCSA term, and we've cited cases in support of that proposition. On the other hand, I'm not going to belabor that point, because I think our interpretation of statutory entitlement is confirmed by multiple provisions of the Deficiency Agreement, not just A, B, C, but also D and E. The village is accused of ignoring the Deficiency Agreement completely, except for A and C, but all of those provisions confirm our reading. And certainly, our interpretation of entitlement as meaning acres is confirmed by multiple provisions of ANCSA itself, the ANCSA implementing regulations, which although we apply for its acres, it fills out a form. The form says entitlement. They put in a number, and that's the way this is always viewed, and I don't think any other interpretation is credible. Any other questions, Your Honor? Thank you very much. Thank you. Mr. Butler? I'd like to clarify this question about whether Siri was negotiating on behalf of the villages. Monroe Price, the statement in the transcripts is from Agnes Brown. She says that Monroe Price is not authorized to speak on behalf of the villages. Monroe Price was asked whether he represented the villages. He said, I do not represent the villages. Buff Boland was asked, who did Monroe Price represent? He said, Siri. He was asked, were the villages represented by counsel? No, they were not. Counsel made reference to Agnes Brown, who wore two hats. Curtis Boland said that he saw Agnes Brown. He did not see Agnes Brown after the day of the meeting on the 23rd. The people that he was dealing with were Carl Mars, Monroe Price, Hondorf, Heiner, all people who were Siri representatives, not village representatives. Now, the reference to supporting legislation, if you look at Exhibit 38, you'll see that what the villages agreed to support was the legislation that's attached as Appendix D. If you look at Appendix D, it is the legislation that was ultimately enacted with a few very minor changes by Congress. The villages certainly do support that because it authorizes the Secretary to convey the lands under selection by them to Siri. Agnes Brown was asked whether, when they saw this, when they signed the village agreement on the 25th, did it contain Appendix D as ultimately went into the agreement, or did it contain some earlier or different version? She said it was Appendix D. On the question of whether this was a status quo ante, I didn't pull that out. I didn't pull teeth out of the witnesses. The government witnesses said that the goal was to restore the status quo ante as nearly as possible. The statement that they got 93% of their selections, they did great. They were negotiated. Nobody on the government side said that they had any intent, motive, desire, to take a single selection away from the villages. Not one. They didn't negotiate those lists. Boland didn't say, I don't want these in there because they're going to be bad for the park. He said it had to be consistent with the terms and conditions, and it was consistent with the terms and conditions, but he didn't say you have to put anything in there. Farron didn't say you had to put anything in there. I hope that this court will give greater deference or pay greater attention to the testimony of Mr. Farron because he was an equal in this process, and he died. If he could have been at this trial, I just feel it would have been so different because he flatly said the intent of this agreement was to give the villages the selections that were rejected by BLM except through a corrective mechanism, and the interpretation that the government is taking of this agreement today is wrong. It is not the intent that I had when we negotiated this agreement. Somehow, because the man wasn't there, because only his black and white deposition was there, all that stuff went out the window. I have nothing further. Thank you very much. Thank you very much. The matter has been submitted, and the court will recess until 9 a.m. tomorrow morning. These were good arguments. I agree. It's a complicated case, so it's very helpful to have good counsel.
judges: Pregerson, Canby, McKeown